Filed 12/22/21  P. v. Ponder CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>KALI PONDER<br><br>      Defendant and Appellant. | A159260<br><br>(Alameda County Super. Ct. No. 617371) |

A jury found defendant Kali Ponder guilty of second degree murder (count 1), assault with a firearm (count 2), and shooting at an inhabited building (count 3) and found various firearm enhancements true (Pen. Code,[1] §§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d)).

Defendant moved to strike the firearm enhancements in the interest of justice under section 1385.  Defendant was an 18-year-old senior in high school at the time of the offenses.  Evidence at trial established he grew up with domestic violence and substance abuse in the home, he was himself the victim of violence, his father was murdered when he was 11 or 12, and he had a history of low cognitive ability and brain-based deficits that affected his executive functioning and decision making.  The trial court made extensive findings regarding defendant's neurodevelopmental disorders, immaturity,

---

[1] Further undesignated statutory references are to the Penal Code.

and history of trauma, relying on these findings to strike the firearm enhancement for count 2. The court, however, denied the motion to strike the 25-year-to-life firearm enhancement under section 12022.53, subdivision (d) (§ 12022.53(d)), in connection with count 1. Defendant was sentenced to an indeterminate term of 40 years to life in prison, plus a concurrent term of seven years.

Defendant contends the trial court (1) erred in answering questions from the jury on provocation and (2) abused its discretion in imposing a firearm enhancement under section 12022.53(d), of 25 years to life.

We find no error in the trial court's responses to the jury's questions. But we agree with defendant that, given that the court made extensive findings related to defendant's particular circumstances, which the court then used as the reason to strike the firearm enhancement in connection with count 2, it was an abuse of discretion to deny defendant's motion to strike the firearm enhancement under section 12022.53(d), in connection with count 1. Accordingly, we will remand the matter for resentencing and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Alameda County District Attorney charged defendant with murder, alleging he killed Lakeya Venson on April 10, 2016, with malice aforethought. Defendant admitted he shot and killed Lakeya, but claimed he was reacting to a man pulling a gun on him.[2] Defense counsel argued defendant's actions were reasonable self-defense or, at most, amounted to manslaughter because he acted in the heat of passion or in imperfect self-

---

[2] Because Lakeya Venson and a witness (her sister) share the same last name, we refer to them by first name for clarity.

2

defense.  The prosecution argued defendant committed first degree premeditated, deliberate murder.

*The Prosecution's Case*

Lakeya Venson had three children and was engaged to Lavon Mitchell, the father of two of her children.  In April 2016, Lakeya's younger sister Keyana Venson lived at a house on Sunnyside Street in Oakland along with many extended family members.

On April 9, 2016, there was a party at the Sunnyside house to celebrate the birthdays of two young family members, including Lakeya's 11-year-old daughter.  Seventeen children and about seven or eight adults attended the party.  The children were generally inside in the living room, and the adults were outside hanging out.

Around 1:00 a.m. (now April 10), the party was still going, and Keyana was outside in front of the house.  There were other adults outside at the time, including her mother, Lakeya, and Lakeya's fiancé Mitchell.  Lakeya was on the porch.

Keyana noticed a car slow down and make a U-turn.  The car stopped, and a person got out of the passenger side; he said, "Y'all Case niggas thought this was a game," and started shooting.  Keyana knew Case was a gang and some of her neighbors identified with the Case gang.  She did not recognize the shooter or his car from the neighborhood.  Keyana ran to the back door and into the house.  From the living room, she saw the car drive away.  On the front porch, her mother was holding Lakeya.

Before the shooting, Lakeya's fiancé, Mitchell, was outside for about 30 to 45 minutes.  He had parked his car in the driveway facing the street, and he was standing in front of his car with his back to the street conversing with two men.  A car pulled up, and he heard someone say, "You Case niggas think

3

it's a game." Mitchell turned around and saw a person about 16 feet away pointing a gun at him. They made eye contact. Mitchell knew Case was a gang in East Oakland, but he was not affiliated with the gang. He ducked and got behind a car that was parked in front of his car. Mitchell did not have a firearm. Right after he ducked, he heard shooting. He saw defendant take a few steps and start shooting toward the porch.

After the shooting stopped, Mitchell heard the car drive off. He found Lakeya on the porch. She said she couldn't move or feel her legs, and Mitchell lifted her shirt and saw a gunshot wound. Later, Mitchell discovered a bullet hole in the windshield of his car.

*Defense*

Defendant testified on his own behalf, and the defense called an expert in clinical psychology who evaluated defendant and conducted neuropsychological testing.

On the day of the shooting in April 2016, defendant was 18 years old and a senior in high school in Richmond. He testified he shot the firearm that killed Lakeya, but it was not his intent to kill her.

Defendant explained how he ended up at the Sunnyside house. On April 9, he went to a skate party in San Ramon with high school friends from the football team. While in the parking lot of the skating rink, one of his friends told defendant that some "guys" stole his chain (a gold necklace). Defendant walked over to the group his friend pointed out to get his friend's chain back. There were seven or eight guys, and one of them had the chain. Defendant asked for the chain, and the person taunted him. One member of the group pulled up his shirt and showed defendant a handgun in the front of his pants. Defendant and his friends left the skating rink.

4

The same day, defendant received a Snapchat video from a girl; she said she knew the guys who took the chain and told defendant to go to 96th, which he understood to mean 96th Avenue in Oakland. Then he and one of his friends drove to Oakland to retrieve his friend's chain.[3] Defendant had a gun in his car, which he said he kept for self-defense.

When he drove by the house on Sunnyside, defendant thought he recognized Mitchell from the parking lot of the skating rink.[4] He made a U-turn and switched places with his friend, so the friend was driving and defendant was in the front passenger seat. His friend stopped the car near Mitchell.

Defendant grabbed his gun and got out of the car, holding the gun in his right hand against his thigh. It was late and he didn't know what was going on, so he grabbed his gun "just for security." He said, "What's up? Y'all [n]iggas got the chain?" Defendant saw Mitchell "[r]each in the front of his pants" and "start pulling out a gun." Defendant was scared and "just reacted" by firing his gun "to make a distraction," so he could leave. Defendant testified he was not trying to shoot anything, and he thought the bullets would go "[o]ver the house, maybe" or "might go aimless." He estimated it took about 20 or 30 seconds from the time he stepped out of his car and demanded the chain to when he got back in the car and his friend drove them away. Defendant did not realize he hit anyone, and he only learned about Lakeya's death when he was arrested on June 3.

---

[3] Defendant did not have an address on 96th Avenue. He thought he would just drive around and find the guys who took his friend's chain.

[4] At trial, defendant acknowledged he was mistaken. In addition, Mitchell was about 30 years old, while the people at the skate party who had taken his friend's chain were younger.

5

Defendant testified that he repeated the first grade and had special education services since sixth grade. He was diagnosed with attention deficit/hyperactivity disorder (ADHD), he had hard time concentrating in class, and he got in trouble at school. Defendant grew up in homes where there was domestic violence and substance abuse by his caregivers. He had no relationship with his father, who showed no interest in him, leaving defendant feeling "a little worthless." His father was murdered when defendant was 11 or 12 years old. School testing showed defendant had low cognitive ability, and he was frustrated, angry, and depressed in class. Defendant was "jumped," meaning "having to fight . . . more than one person," many times. And he was suspended from school for fighting many times.

On cross-examination, defendant agreed one of the gun shots would have hit Mitchell if he had not dived to the ground. Defendant admitted he affiliated with the gang Stubby/ENT but denied he was a gang member. He knew people who were associated with Stubby/ENT who had been killed. His cousin was killed by a gang member. He knew the guys who stole his friend's chain were Case gang members "because of what they were throwing up and saying." He knew Case and Stubby were rival gangs. Defendant admitted that when he was questioned by the police about the shooting, he told them he was shooting at "some suckas" and "Case niggers." Defendant knew before April 10 that the Sunnyside house was a "Case house."

Dr. Hugh Molesworth, a clinical psychologist, testified in the defense case. Dr. Molesworth reviewed records, met with defendant three times and administered testing, interviewed defendant's mother, and prepared a report on defendant's cognitive, psychological, and personality development. Defendant had a history of neurodevelopmental disorder evidenced by his

6

record of ADHD and learning disability. Dr. Molesworth explained that the frontal lobe of the brain is still developing until a person is about 25 years old. Eighteen-year-olds in general are still developing impulse control and "future-orientated perspective," and defendant was somewhat delayed compared to others his age. Molesworth diagnosed defendant with atypical depressive disorder, which featured outbursts of anger. Defendant's IQ score was in the low-average range. Molesworth observed that defendant struggled with some elements of his traumatic experiences. Defendant's disorders lead to weaknesses in decision making, impulse control, planning, and emotional control.

## DISCUSSION

A.  *The Trial Court's Responses to Jury Questions on Provocation*

Defendant argues the trial court inadequately addressed questions from the jury on provocation and cut off deliberations in violation of his rights to due process and trial by jury. We disagree.

### 1.  Background

The trial court instructed the jury on, among other things, general principles of homicide (CALCRIM No. 500), justifiable homicide in self-defense (CALCRIM No. 505), murder with malice aforethought (CALCRIM No. 520), first degree murder (CALCRIM No. 521), the effect of provocation on the degree of murder (CALCRIM No. 522), voluntary manslaughter, heat of passion (CALCRIM No. 570), voluntary manslaughter, imperfect self-defense (CALCRIM No. 571), and the principle that self-defense may not be contrived by the defendant (CALCRIM No. 3472).

#### a.  *First Jury Question, Discussion, and Response*

Late in the afternoon of the second day of deliberations, the jury submitted the following to the court: "Elaboration on the definition of

Provocation [¶]  Since Imperfect Self Defense does not apply when the defendant, through his own conduct, has created the circumstances, does this concept also apply to provocation?"[5]

The next morning, the trial court and counsel discussed how to respond to the jury's request.  The court suggested it would refer the jury back to CALCRIM No. 200 ("Duties of Judge and Jury"), which the court described as "tell[ing] them to pay careful attention to all of these instructions and consider them together, and it also has the language about words and phrases . . . specifically defined in these instructions."

Defense counsel stated that he understood the jury's request as having two parts: first, the jury was asking for an elaboration on the meaning of provocation and, second, it was asking whether "we import an element of imperfect self-defense into provocation."  As to the first part, he agreed with the court that the jury should be referred to CALCRIM No. 200.  As to the second part, defense counsel urged, "we do not answer that."  He said, "I think that the instructions, as a whole, are clear.  And on that [second] part, I think the prudent answer is refer them back to the instructions that they already have."

The court noted that counsel and the court were trying to understand what the jury was asking and perhaps the first step would be to ask "for more clarity on what they're asking for."  The prosecutor acknowledged the difficulty of interpreting jury questions and said it would be "a little troublesome" to try to answer further "because any way you kind of give an

---

[5] The instruction the jury was given on imperfect self-defense included the proviso, "Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force."  (CALCRIM No. 571.)

8

explanation is trying to interpret, I guess, what their question was." Defense counsel observed, "sometimes a couple rereadings [of the instructions], the answers are there." He recommended, "[S]ending them back the instructions for a fresh read I think is the first thing to do and then see if they have [something] more specific."

The trial court wrote out a proposed response, and defense counsel had no objection.

At 10:25 a.m. on the third day of deliberation, the court's written response was sent to the jury. It provided: "I refer you back to the last 3 Paragraphs of Instruction 200:

"Pay careful attention to all of these instructions and consider them together. If I repeat any instruction or idea, do not conclude that it is more important than any other instruction or idea just because I repeated it.

"Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings.

"Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

"The instructions which address provocation are 522 and 570. If you have further specific questions after rereading these instructions please ask. [¶] Judge Burgess" (Bolding deleted.)

9

b.      *Second Jury Question, Discussion, and Response*

An hour later, the jury sent the court another question.  It read: "With regard to Count 1 [murder] we have reached agreement on Second Degree Murder.  We have been diligently debating provocation, and the application of the concept of provocation.  [¶] Since we have reached agreement on the verdict, are we required to continue to discuss provocation?"

The trial court and counsel discussed how to respond.  The trial court proposed a response that it was not the court's role to tell the jury what its verdict should be and to refer the jury back to CALCRIM No. 3550.[6]  Defense counsel agreed with this proposed response.

The prosecutor said he read the question to mean the jury had determined defendant committed *at least* second degree murder and the jury was considering provocation because it was debating between first degree and second degree murder.  He therefore asked the court to instruct the jury that "provocation must be sufficient to negate the required mental state of first degree murder."

Defense counsel disagreed with the prosecutor on what the question meant about the jury's deliberations; he suggested the jury was struggling

---

[6] CALCRIM No. 3550 ("Pre-Deliberation Instructions") provides in part: "Do not reveal to me or anyone else how the vote stands on the question of guilt unless I ask you to do so.  [¶] Your verdict on each count and any special findings must be unanimous.  This means that, to return a verdict, all of you must agree to it.  [¶] It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."

The instruction also states: "It is your duty to talk with one another and to deliberate in the jury room.  You should try to agree on a verdict if you can.  Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors."

with whether second degree murder should be *reduced* to voluntary manslaughter based on heat of passion. He asked the court to direct the jury to the last clause of CALCRIM No. 570, which states, "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of sudden quarrel or heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

After hearing counsels' arguments, the trial court offered its own hypothesis. "To me it seems like, . . . if they've already come to an agreement with regard to second degree murder, it doesn't necessarily seem like they're struggling with . . . the issue of provocation. · It may be some confusion because of [CALCRIM No.] 522 . . . and that they think that they need to apply that in some way even though they've been able to reach an agreement with regard to second degree murder."[7]

Defense counsel responded, "I think, until they have decided amongst themselves that the People have met their burden of proving beyond a reasonable doubt that the provocation *doesn't* apply, they're not done with their duty and, therefore, if nothing else, *the court's initial take on what to do is the correct one* without inserting any of the additional language that either the People or I requested." (Italics added.)

The court concluded: "All right. · I think to do anything else is us kind of speculating about what their dilemma is. · I don't know what their dilemma

---

[7] CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

is. · Their questions are kind of—it's hard to know. · I mean, it has something to do with provocation. · They have some question about that because those instructions are in there, but they also have told us that they've been able to reach a unanimous verdict with regard to one of the issues." The court stated it was going to give the response it initially suggested, and counsel had no objection.

Thus, the court gave the jury the following response to its second question: "It is not my role to tell you what your verdict should be. (From Instruction 3550) Please review this instruction. [¶] It is your duty to deliberate and discuss all issues if they impact your ability to reach a unanimous verdict."

2.     Analysis

Section 1138 "provides that when the jury 'desire to be informed on any point of law arising in the case, . . . the information required must be given. . . .' The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.] . . . But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*).)

12

In *Beardslee,* the jury submitted a question about defining first degree murder. (53 Cal.3d at p. 96.) The trial court told counsel it would not be explaining any instructions because " '[e]very time a judge opens his big mouth and tries to explain what an instruction means, he puts his foot in it and the Appellate Court promptly bites it off.' " (*Ibid*.) The court then told the jury: " '[T]here is and can be no explanation of the instructions. You have to just work with them as they are printed. . . . [¶] All of those instructions have to be considered as a whole. Do the best you can with them.' " (*Id*. at pp. 96–97.) Our Supreme Court, however, held "a court must do more than figuratively throw up its hands and tell the jury it cannot help," even while recognizing "[t]he trial court [in *Beardslee*] was understandably reluctant to strike out on its own." (*Beardslee, supra*, 53 Cal.3d at p. 97.)

Here, in stark contrast to *Beardslee*, the trial court did not refuse to answer the jury's questions. Rather, in consultation with counsel, it considered how it could aid the jury and decided that referring to the instructions already given was preferable to attempting to fashion additional explanation. On this record, we find no error in the trial court's responses to the jury's questions.

As to the jury's first question on provocation, defendant argues the trial court "had a duty to give [the jury] a straight answer, or at the very least clarify the question so that the court understood the issue." But the court did give a straight answer, clearly referring the jury to the instructions on provocation in CALCRIM Nos. 522 and 570. And what is more, the court also reasonably provided the jury an opportunity to clarify its question, concluding, "If you have further specific questions after rereading these instructions, please ask." This response was appropriate.

13

Defendant seems to suggest the court was *required* to answer, "no," to the question, "Since Imperfect Self Defense does not apply when the defendant, through his own conduct, has created the circumstances, does this concept also apply to provocation?" He argues *People v. Wright* (2015) 242 Cal.App.4th 1461 (*Wright*), supports this answer. We do not read *Wright* as providing so definitive an answer.

Our high court has repeatedly recognized, "No case has ever suggested . . . that . . . predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter." (*People v. Jackson* (1980) 28 Cal.3d 264, 306, disapproved of on another point by *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3; *People v. Rountree* (2013) 56 Cal.4th 823, 855 [quoting *Jackson*]; *People v. Blacksher* (2011) 52 Cal.4th 769, 833 [quoting *Jackson*].)

In *Wright*, the court surveyed cases on the "predictable conduct" of resisting victims and made the following observation. "In each case, the victims' resistance was to the defendant's felonious conduct that preceded the lethal assault. More importantly, in all of these cases, no theory of provocation was presented at trial—no sudden quarrel, no simmering response to a provocatory course of conduct—other than the victims' predictable reactions to the defendants' assaults." (*Wright, supra,* 242 Cal.App.4th at p. 1493.) In *Wright*, on the other hand, evidence at trial showed a "long-simmering conflict" between the defendant and the victim. (*Id.* at p. 1495.) The *Wright* court concluded that the *Jackson* line of cases did not mean "the 'predictable conduct' principle should preclude the jury's consideration of a defense theory that defendant's heat of passion *was ignited by a series of provocative acts on the part of the victim over a considerable period of time*"; the court held, therefore, that the lower court erred in

14

refusing to instruct the jury on provocation. (*Id.* at pp. 1493–1494, italics added.)

Thus, there is no question that, in general, the "predictable conduct by a resisting victim" does not constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter. (*People v. Rountree*, *supra*, 56 Cal.4th at p. 855; see *People v. Vargas* (2020) 9 Cal.5th 793, 828 [" '[p]redictable and reasonable conduct by a victim resisting felonious assault is not sufficient provocation to merit an instruction on voluntary manslaughter' "].) Under *Wright*, however, provocation may apply when the victim engages in a series of provocative acts over a long period. (*Wright*, *supra*, 242 Cal.App.4th at p. 1493.)

But in this case, there was no simmering conflict between defendant and Mitchell. Defendant had never met Mitchell before the night he shot at him. We do not read *Wright* to mean the correct, complete, and required answer to the jury's first question is a simple "no." If anything, the facts and reasoning of *Wright* show a pithy and definitive explanation on how the law of provocation works in all situations is not possible. Moreover, an answer of "no" without elaboration would risk misleading the jury that provocation could apply even when the victim's "provocatory" conduct is nothing more than predictable resistance to the defendant's felonious act.

In short, we find no fault with the trial court's response to the jury's first question.

As to the jury's second question, defendant asserts the trial court's response was inadequate and "cut off further deliberations." We are not persuaded. Defendant argues the court "threw up its hands" by saying, "I don't know what their dilemma is." As we have described, the court discussed the jury's question with counsel, considered counsels' varying

15

readings of the question, and stated its own interpretation of the question. Only after this discussion did the court observe that any response other than referring the jury to CALCRIM No. 3550 would be "speculating about what their dilemma is" and, "I don't know what their dilemma is." On this record, we cannot say the court figuratively threw up its hands. On the contrary, the court properly considered how it could best aid the jury and prudently decided further explanation was not desirable and, instead, reiterating the instructions already given was preferable. (*Beardslee*, *supra*, 53 Cal.3d at p. 97.)

Defendant suggests the jury was at an "impasse" and the court "cut off" deliberation, but the jury did not report it reached an impasse, and even assuming the second question conveyed a potential impasse, nothing in the court's response cut off the jury's deliberations. The court referred the jury to CALCRIM No. 3550, which in turn instructed that the verdict on each count must be unanimous and, "You should try to agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors." The court's response to the jury's second question was not error.

Because we find no error, we do not consider whether there was prejudice. We pause to note, however, that in his attempt to establish prejudice, defendant takes jurors' posttrial letters to the court out of context in a highly misleading way. Three jurors urged leniency in sentencing based on defendant's life circumstances, including his age, background of trauma, mental capacity, and ADHD diagnosis. Defendant claims these letters show these jurors were still considering whether provocation might reduce the murder to voluntary manslaughter when the jury reached its verdict. But the letters demonstrate only the jurors' concern that defendant's offenses

16

may have been at least partially the result of his neurodevelopmental disorders and ADHD; the letters cannot fairly be read as suggesting the jurors found defendant was provoked by Mitchell.[8]

B.      *Motion to Strike Firearm Enhancement*

Defendant contends the trial court abused its discretion in denying his motion to strike the firearm enhancement of 25 years to life in connection with count 1 given the evidence presented and the court's own findings.

1.      Background

The jury found defendant guilty of second degree murder (count 1), assault with a firearm (count 2), and shooting at an inhabited building (count 3).  For counts 1 and 3, the jury found true the firearm enhancement allegation that defendant personally discharged a firearm causing death (§ 12022.53(d)), and for count 2, it found true the allegation he personally used a firearm (§ 12022.5, subd. (a)).  The punishment for second degree murder is 15 years to life (§ 190, subd. (a)), and the enhancement for personal discharge of a firearm causing death is 25 years to life (§ 12022.53(d)).  (The

_____

[8] One juror wrote, "In regard to his age, and knowing his background of ADHD, I truly believe his reaction was not intentional and he was reacting to a buildup of anger, frustration and possibly peer influence."  Another juror, who had a younger sister with severe ADHD, wrote that the sister "fixated on an issue" and was "unable to easily deescalate."  After recounting this personal anecdote, the juror continued, "I believe Mr. Ponder was not in complete control of his action that evening.  Given his home history, school bullying, his IQ, diagnosis, and age, Kali's weaknesses were stacked against him.  Yes, he made a terrible choice, and there should be a consequence for those actions."  None of these statements suggests the jurors believed defendant killed in a heat of passion *that was provoked by Mitchell's conduct* (or that Mitchell's conduct would have caused an ordinary person of average disposition to act rashly).  Instead, these jurors seem to have been moved by Dr. Molesworth's testimony regarding defendant's neurodevelopmental deficits and impulsivity and defendant's personal life circumstances.

17

punishment for firearm use under section 12022.5, subdivision (a), is three, four, or 10 years.)

Defense counsel filed a motion to strike all of the firearm enhancements in the furtherance of justice pursuant to section 1385, supported by voluminous records including Dr. Molesworth's 36-page psychological evaluation. Counsel reminded the court that defendant was a high school senior and only 18 years old at the time of the offenses, that he had a learning disability and ADHD, and that his father ignored him while he was alive, leaving him with a sense of worthlessness, and then was murdered when defendant was 11 years old. He cited Dr. Molesworth's testimony, defense counsel's letter to the Probation Department, and letters from jurors who were "very affected by [defendant's] life circumstances" (see fn. 8, *ante*).[9] Defense counsel observed that defendant was "quite shy," "always polite," and wrote, "He has grown in the last three years, and will continue to grow and mature. He has potential. He is redeemable."[10]

Defendant further asserted Senate Bill No. 620 (2017–2018 Reg. Sess.)[11] was passed "because mandatory imposition of lengthy firearm

---

[9] The motion noted, "At the close of the case, many jurors wanted defense counsel contact information to find out more and how they could help Mr. Ponder. That is rather extraordinary given they just voted unanimously to convict him of murder. Several jurors have followed up with phone calls to defense counsel, emails, and one meeting."

[10] In a similar vein, the probation officer's report noted, "defendant was polite and forthcoming" and "appeared to express genuine remorse for the Victim, indicating he is truly sorry and did not mean for this to happen at all" and concluded, "he appears to be amenable to rehabilitation, as well as restorative justice."

[11] Effective January 1, 2018, this law "gave trial courts previously unavailable discretion to strike or dismiss firearm enhancements otherwise

18

enhancements has not proved to be an effective deterrent to violent crime and has caused new problems," such as hugely increasing the population of incarcerated persons and disproportionally increasing racial disparities in imprisonment, and he argued striking the enhancements would serve the purpose of Senate Bill No. 620.

Finally, defendant argued the trial court had discretion to substitute lesser firearm enhancements (such as the enhancements under section 12022.53, subdivisions (b) or (c) or section 12022.5) in place of section 12022.53(d)'s 25 years to life for counts 1 and 3. For this proposition, defendant cited *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*) and *People v. Fialho* (2014) 229 Cal.App.4th 1389.[12]

At sentencing, the trial court recognized it had discretion under *Morrison*, *supra*, to impose a lesser included firearm enhancement, but it denied defendant's motion as to count 1 outright, stating it believed 40 years

---

required to be imposed" under sections 12022.5 and 12022.53. (*People v. Baltazar* (2020) 57 Cal.App.5th 334, 337.)

[12] In *Morrison*, *supra*, 34 Cal.App.5th at page 222, Division Five of our court held a trial court has discretion to impose an *uncharged* lesser included enhancement after striking an enhancement under section 12022.53. Here, the district attorney did charge defendant with lesser included firearm enhancements in respect to counts 1 and 3, but it appears the jury was not instructed on these lesser included enhancements or given verdict forms for them. We observe that the *Morrison* holding was rejected by the Fifth District Court of Appeal in *People v. Tirado* (2019) 38 Cal.App.5th 637. The *Tirado* court reasoned the language of section 1385, subdivision (a), "indicates the court's power . . . is binary: The court can choose to dismiss a charge or enhancement in the interest of justice, or it can choose to take no action. There is nothing in either statute that conveys the power to change, modify, or substitute a charge or enhancement." (*Id*. at p. 643.) The California Supreme Court granted review in *Tirado*, S257658, and heard oral argument on November 3, 2021. (See https://www.courts.ca.gov/documents/ calendars/SNOV321C.PDF.)

to life was "the appropriate sentence" for count 1 "for the loss of Ms. Venson's life, especially in the manner in which it happened, in this case."

The court did, however, strike the firearm enhancement for count 2. The court explained its reasons for exercising its discretion to strike the firearm enhancement in great detail: "The report and testimony of Dr. Molesworth outline[ ] several factors and circumstances in mitigation which relate to the defendant's background, individual life circumstances, and the nature of the present offense. · These considerations are addressed extensively in the 36-page report submitted by Dr. Molesworth and admitted into evidence. · I will highlight the factors in the report which impacted my decision to strike the personal use sentence enhancement in count two.

"First, it's a fact that the defendant was 18 years old at the time of the offense, has a history of neuro-developmental disorder as demonstrated in school records evidencing delays from as early as first grade, which he had ·to repeat. · He also has an overall borderline low-to-average intellectual ability with weaknesses in executive functioning. His condition includes features of ADHD, deficits in impulse control, decision making and attention.

"The DSM-V diagnosis of history of conduct disorder, unspecified, depressive disorder, cannabis use disorder, . . . and a moderate history of neurodevelopmental disorder. · These factors, in conjunction with the extensive research, related to immature brain development in adolescence between the ages of 12 and 25 and relationship of incomplete brain development to functional maturity and decision making are part of the factors that this Court took into consideration. [¶] The court also looked at the defendant's background and history which include significant family dysfunction and adverse childhood experiences and trauma, including poor parental supervision and management, multiple and some inconsistent

20

caregivers with substance abuse problems. And the report also indicated domestic violence in the home, trauma history in the home, and a violent community environment. The report also details disruptive and inadequate relationships to parental figures, parental criminality, and murder of Mr. Ponder's father at age 12.

"Dr. Molesworth's report also indicated that the defendant has a documented and long-standing learning disability as indicated by special education classes and eligibility for I.E.P. services starting at fourth grade, as I stated, retention in first grade and I.E.P. from seventh grade through high school, which is understandable in light of his cognitive deficits.

"The defendant also has a history of juvenile delinquency beginning at age 14, a history of two out-of-home placements, and school records which indicate a history of aggressive behavior, and probation records that indicate gang involvement.

"It is the combination of all of these factors that informed my decision to exercise my discretion pursuant to 1385(a) and the sentencing enhancement with regard to count two."[13]

2.    Analysis

We review a trial court's decision whether to strike an enhancement under section 1385 for abuse of discretion. (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116.) "This standard is deferential. [Citations.] But it is not empty. Although variously phrased in various decisions [citation], it asks in substance whether the ruling in question 'falls outside the bounds of

---

[13] As to the firearm enhancement for count 3 (shooting at an inhabited building), the court imposed a term of 25 years to life and stayed it pursuant to section 654.

21

reason' under the applicable law and the relevant facts." (*People v. Williams* (1998) 17 Cal.4th 148, 162.)

Here, the court found defendant's developmental disorders, low intellectual ability, weak executive functions, ADHD, depression, history of family dysfunction and adverse childhood experiences, and the research showing the "relationship of incomplete brain development to functional maturity and decision making" warranted striking the firearm enhancement for count 2 in "the furtherance of justice." But these factors are equally relevant to count 1, yet the court refused to strike that firearm enhancement. Further, even though the court seemingly intended to grant defendant some relief from the harshness of the previously mandatory firearm enhancements by striking the enhancement for count 2, the action has no practical effect since the term for count 2 is to be served concurrently with count 1. On this record, given the trial court's own express findings regarding the constellation of issues and circumstances affecting defendant (including his immaturity, neurodevelopmental deficits, and traumatic upbringing) and its determination that the interest of justice would be served by striking the firearm enhancement in connection with count 2, we believe this is the rare case where the court's ruling falls outside the bounds of reason. This tragic incident took place in a matter of seconds. It is hard to fathom how on the facts of this case the court could make such detailed findings about defendant and apply them to one split second and not the ones that followed. We are not holding that no court could deny defendant's motion to strike without abusing its discretion. We conclude only that the ruling the trial court made in this case was not within the bounds of reason.

We therefore remand the matter for the court to reconsider its sentencing in light of the views expressed in this opinion. We need not reach

defendant's argument that the sentence violates the state constitutional proscription against cruel or unusual punishment.  (See *People v. Williams* (1976) 16 Cal.3d 663, 667 ["we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us"].)  On remand, the trial court may also consider whether to substitute lesser included enhancements as suggested by defendant in his motion to strike unless our high court rules that trial courts do not have such discretion.  (See *People v. Tirado*, S257658.)

## DISPOSITION

The sentence is vacated, and the matter is remanded for resentencing in light of the views expressed in this opinion.  In all other respects, the judgment is affirmed.

_____

Miller, J.

WE CONCUR:


_____

Richman, Acting P.J.


_____

Stewart, J.


A159260, *People v. Ponder*

24